UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NOTHERN DIVISION

| | |
|---|---|
| SCOTT HUNT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No: 2:05-cv-1160-T |
| v. | ) |
| | ) |
| CITY OF MONTGOMERY and | ) |
| KEVIN J. MURPHY, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS, CITY OF MONTGOMERY AND K.J. MURPHY**

Defendants, City of Montgomery and K.J. Murphy submit the following Memorandum of Law in support of their Motion for Summary Judgment, and state unto the Court the following:

SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of genuine issue of material fact.'" *Id.* at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing, or pointing out to, the district court that the non-moving party has failed to present

EXHIBIT A

evidence in support of some element of the case on which it bears the ultimate burden of proof. *Id.* at 322-324.

Once the non-moving party has met its burden, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file 'designate' specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), FRCP. Similarly, the moving party is entitled to summary judgment if the non-moving party has failed to prove the elements of his case or there is the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. *Fitzpatrick v. City of Atlanta,* 2 F. 3d 1112, 1115-16 (11th Cir. 1993).

Additionally, conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c).

### PROCEDURAL BACKGROUND

This lawsuit was filed on December 7, 2005. Plaintiff Scott Hunt ("Hunt") named as Defendants the City of Montgomery ("the City") and Major Kevin J. Murphy ("Murphy"), Commander of the Patrol Division of the Police Department for the City of Montgomery. The Complaint contains one count for First Amendment based retaliation pursuant to 42 U.S.C. § 1983.

Defendants filed an Answer on January 4, 2006 with affirmative defenses. The trial is set for December 11, 2006.

### NARRATIVE STATEMENT OF FACTS

On December 28, 2004, Major K.J. Murphy requested that Internal Affairs be assigned to investigate formal complaints that had been filed by members of second shift patrol against four African-American officers for using racial derogatory language and creating a hostile work environment. *(DX 1, Affidavit of K.J. Murphy)*. Additionally, it was alleged that the three officers had potentially assaulted another member of the shift which was former patrol officer Scott Hunt. *(DX 1, Affidavit of K.J. Murphy)*.

An internal affairs investigation was opened for potential violations of departmental policy on the three officers for rule violations found in Article I, Section 1.315 – Conduct Unbecoming an Officer; Article I – Section 1.330 – Duties of Responsible Employment: Respect to Other Members and Employees and Article I: Section 1.520 – Racial Harassment Policy and Statement of the Montgomery Police Departmental Manual. As part of this investigation, statements were taken from Scott Hunt on December 28, 2004, January 4, 2005 and January 7, 2005. Another officer was charged for rules violations due to the fact that he lied during the internal affairs investigation. *(DX 1, Affidavit of K.J. Murphy)*. Following the investigation, disciplinary procedures were initiated against the four officers. *(DX 2, Affidavit of M.B. Trotter)*.

The assault incident occurred by three officers after second shift in the parking lot at headquarters. *(DX 1, Affidavit of K.J. Murphy)*. One of the officers tackled Officer Hunt. Another one of the officers took Officer Hunt's service weapon from his holster, unloaded it and gave it back

3

to him while one of the officers commented to take his gun because white boys will go home and kill themselves. *(DX 1, Affidavit of K.J. Murphy)*.

The four officers were given hearings at the division level and before the trial board. *(DX 1, Affidavit of K.J. Murphy)*. The trial board hearing was conducted before two Majors from other divisions and the Deputy Chief. *(DX 1, Affidavit of K.J. Murphy)*. The Chief of Police recommended to the Mayor's office that the four officers be terminated. *(DX 1, Affidavit of K.J. Murphy)*. The Mayor upheld the recommendation. *(DX 1, Affidavit of K.J. Murphy)*. Three of the officers appealed to the City/County of Montgomery Personnel Board. *(DX 3, Affidavit of Karen Cason)*. The hearing on the appeal to the City/County of Montgomery Personnel Board was held on May 4, 2005. *(DX 3, Affidavit of Karen Cason)*.

Officer Hunt was also disciplined in the matter for rules violation of Article I, Section 1.330, Duties of Responsible Employment for Prompt and Accurate Reporting of all Official Matters. *(DX 1, Affidavit of K.J. Murphy)*. At the division level, Murphy recommended that Officer Hunt receive a five (5) day suspension. *(DX 1, Affidavit of K.J. Murphy)*. However Officer Hunt disagreed with Murphy's recommendation and appealed to the trial board. *(DX 1, Affidavit of K.J. Murphy)*. Rather than confirm Murphy's recommendation, the trial board gave Officer Hunt a ten (10) day suspension. *(DX 1, Affidavit of K.J. Murphy)*. The Chief upheld the recommended ten (10) day suspension of the trial board. *(DX 1, Affidavit of K.J. Murphy)*. Officer Hunt was also required to return to the Police Academy to attend Weapon Retention and Safety Courses. *(DX 1, Affidavit of K.J. Murphy)*.

On Friday, May 6th at approximately 1649 hours, Unit 223, Officer S. A. Hunt, responded to Taco Bell at 5380 Atlanta Hwy to assist another unit with a possible subject, involved in an earlier

theft. Hunt was later canceled by the first unit before he arrived at the Taco Bell. *(DX 4, Affidavit of A.J. Pollard).*

After that, the dispatcher attempted to raise Hunt several times on the radio. *(DX 4, Affidavit of A.J. Pollard).* Sgt. A.J. Pollard then advised the dispatcher to raise him by his identification number. *(DX 4, Affidavit of A.J. Pollard).* Officer Hunt finally acknowledged when the dispatcher called him by his identification number. *(DX 4, Affidavit of A.J. Pollard).* Officer Hunt, who appeared to be out of breath, put himself out at Woodvale Drive on a disturbance. *(DX 4, Affidavit of A.J. Pollard).* Another unit, unit 206, had been dispatched to this residence on a disturbance call and had not yet arrived. *(DX 4, Affidavit of A.J. Pollard).* Officer Hunt advised Sgt. Pollard that he was on Atlanta Hwy when the Woodvale Drive call was dispatched and responded to assist. *(DX 4, Affidavit of A.J. Pollard).*

Officer Hunt told Sgt. Pollard that he made contact with a 17 year old white female that had struck her mother with an umbrella during an argument. *(DX 4, Affidavit of A.J. Pollard).* Officer Hunt advised Sgt. Pollard that Hunt attempted to talk with the juvenile however she became irate and threw a portable phone to the ground. *(DX 4, Affidavit of A.J. Pollard).* Officer Hunt informed Sgt. Pollard that as he attempted to place the juvenile in custody she began to hit, punch and kick him in the abdomen and at that point, he sprayed her with mace. *(DX 4, Affidavit of A.J. Pollard).*

At approximately 2140 hours, Officer Hunt entered the supervisor's office and advised Sgt. Pollard that he had signed a harassment petition on the 17 year old white female. Officer Hunt further stated that the mother refused to prosecute. *(DX 4, Affidavit of A.J. Pollard).* During this conversation Sgt. Pollard also asked Officer Hunt if he take any photographs of the visible injury and he replied no but he did do a report for Domestic Violence 3rd. *(DX 4, Affidavit of A.J. Pollard).*

Officer Hunt had no excuse for not taking any photographs of the injury. *(DX 4, Affidavit of A.J. Pollard).* Sgt Pollard asked Officer Hunt if he understood that it was standard procedure to take photographs and he stated that he did. *(DX 4, Affidavit of A.J. Pollard).*

Later that evening, after reviewing Officer Hunt's Aerosol Restraint form, Lieutenant O'Banion and Sgt. Pollard noticed that Officer Hunt had left out pertinent information on the mace form, and therefore Officer Hunt did not show probable cause to make an arrest of the juvenile. *(DX 4, Affidavit of A.J. Pollard).* Lieutenant O'Banion and Sgt. Pollard questioned Officer Hunt about the arrest. Lieutenant O'Banion read Officer Hunt's statement to him and advised him to explain in detail what happened at the scene. *(DX 4, Affidavit of A.J. Pollard).* Officer Hunt explained in detail and Lt. O'Banion asked Officer Hunt why he didn't put all this information on his mace form and Officer Hunt replied that he thought that it was not needed. *(DX 4, Affidavit of A.J. Pollard).*

Lt. O'Banion advised Officer Hunt that he should have included all the facts of the case to show probable cause and justification for any action taken by him. *(DX 4, Affidavit of A.J. Pollard and DX 5, Affidavit of D.W. O'Banion).* Lt. O'Banion advised Officer Hunt that it was his responsibility to have signed a petition on behalf of the mother when she refused to prosecute due to the fact that there were visible physical injuries and the corroborating statement made by the mother while at the scene. *(DX 4, Affidavit of A.J. Pollard and DX 5, Affidavit of D.W. O'Banion).*

Sgt. Pollard prepared a memo regarding the incident and potential rules violations and submitted it to Lt. O'Banion. *(DX 4, Affidavit of A.J. Pollard).* Lt. O'Banion contacted Murphy on the weekend and advised him of the incident. *(DX 1, Affidavit of K.J. Murphy and DX 5, Affidavit of D.W. O'Banion).* Lt. O'Banion advised Murphy that he would forward a memorandum concerning the infraction. *(DX 1, Affidavit of K.J. Murphy).* It is standard procedure that Murphy is called and

6

advised of something and given a written report following it up. *(DX 1, Affidavit of K.J. Murphy).*

Murphy received a copy of a memo that had been prepared by Sgt. A.J. Pollard for Lt. O'Banion. *(DX 1, Affidavit of K.J. Murphy).* Murphy advised Colonel A.D. Baylor of potential rules and regulations violation of Article I, Section 1.330, Duties of Responsible Employment; Proper Discharge of Assignment. *(DX 1, Affidavit of K.J. Murphy).* On May 9, 2005, Murphy requested that Internal Affairs be assigned to investigate the matter. *(DX 1, Affidavit of K.J. Murphy).* Murphy usually recommends a 3 day suspension for the rules violation in question (Proper Discharge of Assignment). *(DX 1, Affidavit of K.J. Murphy).*

An internal affairs investigation was opened in May 2005 for potential violations of departmental policy by Scott Hunt of rules violations found in Article I – Section 1.330 Duties of Responsible Employment; Proper Discharge of Assignment of the Montgomery Police Departmental Manual. *DX 2, Affidavit of M.B. Trotter).* As part of that investigation, Hunt gave a statement on May 31, 2005. *(DX 2, Affidavit of M.B. Trotter).*

Scott Hunt resigned from the Montgomery Police Department while the internal affairs investigation was still pending. At that point, the investigation was closed. *(DX 1, Affidavit of K.J. Murphy and DX 2, Affidavit of M.B. Trotter).*

Lt. O'Banion nor Sgt. Pollard participated in the internal affairs investigation in December 2004 of Scott Hunt and the four officers. *(DX 4, Affidavit of A.J. Pollard and DX 5, Affidavit of Lt. D.W. O'Banion).*

**ARGUMENT**

I.   **CLAIM OF RETALIATION**

A. HUNT'S FIRST AMENDMENT CLAIM BASED ON UNCONSTITUTIONALLY PROTECTED SPEECH.

Hunt has filed this lawsuit claiming First Amendment based retaliation, brought pursuant to 42 U.S.C. §1983. Hunt claims that his speech was protected by the First Amendment and that he spoke on a matter of public concern – misconduct in the City's police department. However, Hunt's testimony was regarding rule and policy violations that occurred as a result of his employment with the police department and subject to an administrative disciplinary process. In fact, it is clear from the allegations of Hunt's Complaint that his speech was pursuant to his employment as a police officer in which he had to testify at hearings in the administrative disciplinary process. *(PL 1, Complaint).* Therefore Hunt cannot prevail on his claim of First Amendment based retaliation because it is based on unconstitutionally protected speech.

The U.S. Supreme Court recently addressed the issue of whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties in *Garcetti, et al. v. Ceballos*, 126 S.Ct. 1951, 2006 WL 1458026 (May 30, 2006). The plaintiff, Richard Ceballos, was employed as a deputy district attorney with the Los Angeles County District Attorney's Office. Pursuant to his duties, Ceballos investigated a complaint from a defense attorney regarding inaccuracies in an affidavit from the sheriff's department used to obtain a search warrant. Ceballos concluded that the affidavit contained factual inaccuracies. Following his investigation, Ceballos prepared a memo outlining his concerns with the affidavit and recommending that the case be dismissed. Ceballos' memo prompted a meeting with his supervisors and members of the sheriff's department that allegedly became very heated. In spite of Ceballos' concerns, the district attorney's office decided to proceed with prosecution. Thereafter, during a hearing on a motion challenging the warrant, Ceballos was called by the defense to testify about his

observations, but the trial court upheld the warrant. Ceballos claimed that he was subsequently subjected to retaliation, including a transfer and denial of a promotion.

The District Court granted Garcetti summary judgment ruling that the memo was not protected speech because Ceballos wrote it pursuant to his employment duties. The Ninth Circuit reversed and held that the memo's allegations were protected speech based on the First Amendment analysis set out in *Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968) and *Connick v. Myers,* 461 U.S. 138 (1983).

However the U. S. Supreme Court reversed the Ninth Circuit and held:

> "When public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."

Therefore, Hunt cannot prevail on his First Amendment based claim of retaliation. It is undisputed that Hunt's testimony was given pursuant to his capacity as a police officer and employee participating in the City's administrative disciplinary process.

In *Ceballos,* the Supreme Court found that the controlling factor in answering the question of whether Ceballos' speech was protected was that his expressions were made pursuant to his official duties. Under these circumstances, the Supreme Court concluded that Ceballos was not acting as a citizen but as a government employee doing what he was employed to do; therefore, his speech did not qualify for First Amendment protection. Specifically, the Court stated:

> "(a) Two inquiries guide interpretation of the constitutional protections accorded public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See *Pickering, supra,* at 568, 88 S.Ct. 1731. If the answer is no, the employee has no First Amendment cause of action based on the employer's reaction to the speech. See *Connick, supra,*

9

at 147, 103 S.Ct. 1684. If the answer is yes, the possibility of a First Amendment claim arises. The question becomes whether the government employer had an adequate justification for treating the employee differently from any other member of the general public. See *Pickering, supra,* at 568, 88 S.Ct. 1731. This consideration reflects the importance of the relationship between the speaker's expressions and employment. Without a significant degree of control over its employees' words and actions, a government employer would have little chance to provide public services efficiently. Cf. *Connick, supra,* at 143, 103 S.Ct. 1684. Thus, a government entity has broader discretion to restrict speech when it acts in its employer role, but the restrictions it imposes must be directed at speech that has some potential to affect its operations.

(b) Proper application of the Court's precedents leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail. The dispositive factor here is not that Ceballos expressed his views inside his office, rather than publicly, see, *e.g., Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619, nor that the memo concerned the subject matter of his employment, see, *e.g., Pickering,* 391 U. S, at 573, 88 S.Ct. 1731. Rather, the controlling factor is that Ceballos' expressions were made pursuant to his official duties. That consideration distinguishes this case from those in which the First Amendment provides protection against discipline. Ceballos wrote his disposition memo because that is part of what he was employed to do. He did not act as a citizen by writing it.

(c) Exposing governmental inefficiency and misconduct is a matter of considerable significance, and various measures have been adopted to protect employees and provide checks on supervisors who would order unlawful or otherwise inappropriate actions. These include federal and state whistle-blower protection laws and labor codes and, for government attorneys, rules of conduct and constitutional obligations apart from the First Amendment. However, the Court's precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job."

To be successful on his claim that the City violated his First Amendment rights to free

speech, Hunt must prove that his speech was done in his capacity as a citizen rather than in the context of his employment. There is nothing to support such a claim. It is undisputed that the speech for which Hunt claims protection was in an administrative disciplinary process for the City of Montgomery. There is no evidence to support that Hunt gave any statement other than pursuant to his employment; therefore, Hunt cannot prevail on his claim of violation of his First Amendment rights. Defendants are entitled to summary judgment as a matter of law.

### B. NON-RETALIATORY REASONS ADMINISTRATIVE CHARGES AGAINST HUNT

Additionally, Hunt cannot prevail on his claim of retaliation by Murphy because Defendants did not engage in any retaliatory action. The individuals that alleged rules violations had no part in the previous disciplinary action. Sgt. Pollard and Lt. O'Banion recognized that Hunt had violated department rules and procedure. *(DX 4, Affidavit of A.J. Pollard and DX 5, Affidavit of D.W. O'Banion)*. Lt. O'Banion advised Murphy of the infraction. *(DX 1, Affidavit of K.J. Murphy DX 5, Affidavit of D.W. O'Banion)*. Murphy advised Colonel A.D. Baylor of potential rules and regulations violation of Article I, Section 1.330, Duties of Responsible Employment; Proper Discharge of Assignment. *(DX 1, Affidavit of K.J. Murphy)*. Murphy treated Hunt like he would any other officer that had been involved in potential rules violations. *(DX 1, Affidavit of K.J. Murphy)*. The administrative charges brought against Hunt were for rules violations based on Hunt's actions. Lt. O'Banion nor Sgt. Pollard participated in the internal affairs investigation in December 2004 of Scott Hunt and the four officers. *(DX 4, Affidavit of A.J. Pollard and DX 5, Affidavit of Lt. D.W. O'Banion)*. The administrative charges against Hunt were for non-retaliatory reasons. Hunt was treated like any other police officer and cannot prevail on his claim of First Amendment based retaliation. Defendants are entitled to summary judgment as a matter of law.

C. HUNT RESIGNED.

Scott Hunt resigned from the Montgomery Police Department effective June 3, 2005. *(DX 1, Affidavit of K.J. Murphy and DX 3, Affidavit of Karen Cason)*. Scott Hunt was a permanent employee of the City of Montgomery. *(DX 3, Affidavit of Karen Cason)* As a permanent employee, Hunt was entitled to due process and could have appealed to the City/County of Montgomery Personnel Department for a hearing regarding any recommended termination. *(DX 3, Affidavit of Karen Cason)*. Hunt did not exhaust any of his administrative remedies but rather resigned.

## II. INDIVIDUAL NAMED DEFENDANT, K. J. MURPHY

### A. OFFICIAL CAPACITY

The Complaint does specify Defendant Kevin Murphy is sued in his individual capacity. In fact, Hunt says that Murphy was an agent or officer of the City and upstream supervisor of Hunt whose conduct proximately caused harm to Hunt. Therefore it appears that the claims against Murphy are in his official capacity only. When a city official is sued in his official capacity, the suit is simply "another way of pleading an action against the entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Wallace v. City of Montgomery*, 956 F. Supp. 955 (M.D. Ala.1996). "Such suits against municipal officers are therefore, in actuality, suits against the city that the officers represent." *Busby v. City of Orlando*, 931 F. 2nd 764, 776 (11th Cir. 1991). Accordingly, there is no longer a need to bring an official capacity suit against a local government official since local government units can be sued directly for damages and/or injunctive or declaratory relief. *Wallace v. City of Montgomery, supra.* In the present case it is undisputed that the City of Montgomery is sued in this case. Consequently, Defendant Murphy, sued in his official capacity should be dismissed.

B. <u>INDIVIDUAL CAPACITY</u>

Murphy's actions of requesting an internal affairs investigation based on the claims of Lt. O'Banion and Sgt. Pollard of rules violations were in the line and scope of his duties and not unlawful or unconstitutional.

Qualified immunity is an affirmative defense to an action pursuant to § 1983 against a government official sued in his or her individual capacity. *See Wilson v. Strong,* 156 F.3d 1131, 1135 (11th Cir.1998). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In order to receive qualified immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro,* 284 F. 3d 1188, 1194 (11th Cir. 2002). It is undisputed that Murphy was acting as Hunt's supervisor and acting in his capacity as a police officer therefore satisfying the first prong of the qualified immunity test. Having established the first requirement, the burden shifts to the Hunt to prove that qualified immunity is not warranted. *Id.* First "the defendant government official must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Sammons v. Taylor,* 967 F. 2d 1533, 1539 (11th Cir. 1992). "Then the burden shifts to the plaintiff to demonstrate that the defendant 'violated clearly established constitutional law.'"

*Id.*

Once the qualified immunity defense is raised, the plaintiff bears the burden of showing that the federal "rights" allegedly violated were "clearly established." *Barts v. Joyner*, 865 F. 2d 1187, 1190 (11th Cir. 1989), citing *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 2816, 86 L. Ed. 2d 411 (1985). For the law to be clearly established to the point that qualified immunity does not apply, it must have earlier been developed in such a concrete and factually defined contest as to make it obvious to all reasonable government actors, in the defendant's place that "what he is doing" violated federal law. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 523 (1987).

"For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel... the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates Federal law <u>in the circumstances</u>." *Lassiter v. Alabama A & M University*, 28 F. 3d 1146, 1150 (11th Cir. 1994) (emphasis in original).

Also, the Eleventh Circuit has held, "When the qualified immunity defense has been raised, an opposing plaintiff must convince the court that the law clearly established that 'the defendant's conduct in the circumstances amounted to 'deliberate indifference.'" *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1185 (11th Cir. 1994) (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1275 (11th Cir. 1989)).

Murphy did not treat Officer Hunt differently than other officer accused of rules violations. *(DX 1, Affidavit of Kevin Murphy).* Any officer involved in rules violations is subject to administrative charges and must comply with internal affairs investigations or risk further disciplinary action. *(DX 1, Affidavit of Kevin Murphy).*

*III.*   CLAIMS AGAINST THE CITY OF MONTGOMERY

In his Complaint, Hunt alleges that the City acted intentionally or wantonly to violate his constitutional rights. However, for civil rights liability pursuant to 42 U.S.C. § 1983 to attach to a municipality, it must be shown that the municipal official or employee caused the deprivation of one's constitutional rights by acting pursuant to official governmental policy.

Not only can Hunt not prevail on his claim of First Amendment based retaliation, Hunt has not submitted evidence that any final policymaker of the City acted with an unconstitutional motive. Merely using the words "policy" or "custom" or "unconstitutional" in the allegation is not sufficient to state a claim under 42 U.S.C. § 1983. *See Monnell v. Dept. of Social Services*, 436 U.S. 658 (1978). Hunt has only made conclusory allegations in an effort to try to make the City liable. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.*Rule 56(c).

A municipality is liable only for its own wrongs and cannot be liable under the theory of respondeat superior. Hunt may not base claims against the City on respondeat superior or vicarious liability; rather, he must show an official policy or custom of the City directly caused the alleged injury to him. A governing entity cannot be held liable in an action brought pursuant to 42 U.S.C.A. § 1983 under a theory of respondeat superior. *Monell v. Department of Social Services of New York City,* 436 U.S. 658, 694 (1978).

In *Monell*, the Supreme Court held that municipalities cannot be liable under §1983 on the theory of respondeat superior, but rather, can be liable under that statute only if they maintain unconstitutional or illegal policies or customs; absent unconstitutional or illegal policies or customs, municipalities and their officials may not be sued for the acts of their employees. Moreover, a

plaintiff must show that an official policy was the reason behind the alleged constitutional deprivation. *Farred v. Hicks,* 915 F. 2d 1530 (11th Cir. 1990).

It is well established that a local government agency or its officials "may only be liable under §1983 if an action pursuant to official policy of some nature caused a constitutional tort." *Church v. City of Huntsville*, 30 F. 3d 1332, 1342 (11th Cir. 1994); *Dowdell v. Chapman,* 730 F. Supp. 533, 545 (M.D. Ala. 1996) (causal link must be established between official policy and custom and plaintiff's injury). It is only when execution of municipal policy or custom inflicts constitutional injury that the municipality or its official policymakers are responsible under §1983. *Monell v. New York Dept. of Social Services, supra* at 694. The Plaintiff must show the official policy or custom was the reason behind the alleged constitutional deprivation. *Farred v. Hicks, supra.*

In some situations a municipality or its officials may be subject to §1983 liability for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval from the bodies of official decision making channels." *Monell v. New York Dept. of Social Services, supra* at 690-91. Such liability requires that the Plaintiff provide evidence that establishes "a widespread practice that, 'although not authorized by written law or express municipal policy is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988). Stated differently, "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Ft. Lauderdale,* 923 F. 2d 1474, 1481 (11th Cir. 1991). In such circumstances, however, "considerably more proof than [a] single incident will be necessary" to establish liability. *Oklahoma City v. Tuttle,* 471 U.S. 808, 834 (1985).

A governmental entity can only be held responsible under §1983 for the unauthorized actions of its employees when its final decision makers participated in a policy or custom which resulted in a constitutional violation or a governmental entity can be held liable under §1983 when constitutional violations arise from "custom", even though the custom is not the product of a formal adoption by the municipal policy making authorities. *Monell*, 436 U.S. 658, 690-691.

In the present case, Hunt cannot succeed on his claim of a practice or custom that would make the City of Montgomery liable under 42 U.S.C. § 1983.

In order to recover there must be a causal connection between the policy or custom of the municipality and the constitutional right alleged to have been violated. *Church v. City of Huntsville,* 30 F. 3d 1332, 1342 (11th Cir. 1994). To establish causation, "a plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Comm'rs. of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404 (1997). The causal link must be such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Spell v. McDaniel,* 424 F. 2d 1380, 1389-91 (4th Cir. 1987); *McCroy v. City of Dothan,* 169 F. Supp. 2d 1260, 1285 (M.D. Ala. 2001). *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) (the identified deficiency must be closely related to the ultimate injury).

In the present case, Hunt's claims against the City must fail. Hunt fails to state any facts that support a theory that the City participated in any policy, practice, or custom which resulted in a violation of §1983. The City of Montgomery is entitled to summary judgment on Hunt's claim of First Amendment based retaliation as there is no genuine issue of any material fact.

## CONCLUSION

Hunt cannot succeed on any claims for First Amendment violations. The undisputed facts provide that Hunt's speech was pursuant to his employment as a police officer with the City rather than as a citizen in a matter of public concern. Additionally, the administrative charges brought against Hunt were for non-retaliatory reasons. Finally, Hunt cannot prevail on his § 1983 claim against the City. Hunt relies only on conclusory allegations. There is no custom or policy of the City that violated his constitutional rights. Conclusory allegations cannot interpose genuine issues of material fact into the litigation so as to preclude entry of summary judgment. *Fed.Rules Civ.Proc.* Rule 56 (c).

Respectfully submitted this 21st day of July, 2006.

/s/ Kimberly O. Fehl
Kimberly O. Fehl (FEH001)

OF COUNSEL:

City of Montgomery
City Attorney's Office
P. O. Box 1111
Montgomery, AL 36101-1111
Telephone: (334) 241-2050
Facsimile: (334) 241-2310

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the following by placing a copy in the United States mail, postage prepaid and properly addressed or electronic email, on this the 21st day of July, 2006.

Jay Lewis, Esq.

*Law Offices of Jay Lewis, LLC*
Suite 100
847 S. McDonough
Montgomery, AL 36104

/s/ Kimberly O. Fehl
OF COUNSEL